# CHICAGO & GRAND TRUNK RAILWAY COMPANY *v.* WELLMAN.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 1031. Argued and submitted January 20, 1892. — Decided February 29, 1892.

The act of the legislature of Michigan of June 28, 1889, (Public Laws of 1889, pp. 282, 283,) fixing the amount per mile to be charged by railways for the transportation of a passenger, violates no provision in the Constitution of the United States, so far as disclosed by the facts in this case.

A legislature has power to fix rates for the transportation of passengers by railways, and the extent of judicial interference is protection against unreasonable rates.

Whenever, in the pursuance of an honest antagonistic assertion of rights, there is presented a question involving the validity of any act of any legislature, State or Federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must determine whether the act be constitutional or not; but it never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act.

Courts should be careful not to declare legislative acts unconstitutional upon agreed and general statements, and without the fullest disclosure of all material facts.

IN 1889 the legislature of the State of Michigan passed an act, number 202 of the Public Acts of that year, pages 282 and 283, by which, among other things, section 2333 of Howell's Statutes, being a part of the railroad law of that State, was amended. So far as affects the matters in controversy here, it is enough to quote from the ninth paragraph, referring to the powers and liabilities of railroad companies. That is as follows:

"Ninth. To regulate the time and manner in which passengers and property shall be transported and the tolls and compensation to be paid therefor; but such compensation for transporting any passenger and his or her ordinary baggage, not exceeding in weight one hundred and fifty pounds, shall not exceed the following prices, viz.: For a distance not exceeding five miles, three cents per mile; for all other distances, for all companies the gross earnings of whose passen-

ger trains, as reported to the commissioner of railroads for the year one thousand eight hundred and eighty-eight, equalled or exceeded the sum of three thousand dollars per mile of road operated by said company, two cents per mile, and for all companies the earnings of whose passenger trains reported as aforesaid were over two thousand dollars and less than three thousand dollars per mile of road operated by said company, two and a half cents per mile, and for all companies whose earnings reported as aforesaid were less than two thousand dollars per mile of road operated by said company, three cents per mile."

Prior thereto the regular fare charged on plaintiff in error's road from Port Huron to Battle Creek was $4.80, the distance being 159¾ miles. On the very day on which the law took effect, to wit, October 2, 1889, the defendant in error, plaintiff below, went to the defendant's office in Port Huron, and tendered $3.20 for a ticket from that place to Battle Creek, which was refused. Thereupon he brought this action in damages, to which the railroad company promptly answered; and on November 22, 1889, less than two months from the time the law went into effect, the case was tried and a verdict and a judgment entered in favor of the defendant in error for the sum of $101, an amount sufficient to take the case to the higher court. On the trial it was agreed that the railroad company's earnings on its passenger trains for the year 1888 exceeded three thousand dollars per mile; that its capital stock was $6,600,000, and had been fully paid in; that its bonded debt was $12,000,000, one half bearing six per cent and the other half five per cent interest, payable semi-annually; that the capital stock and mortgage debt represented an actual amount paid into the corporation; that the railroad property was at the time worth more than the capital stock and mortgage debt; and that in addition to the mortgage debt there was a floating debt of the amount of $896,906.40. Further, the following tabulated statement of the earnings and expenses for the year 1888 was admitted to be correct:

"7th. That the total earnings and income of the defendant from all sources for the year 1888 was $3,228,338.17.

" Of this amount there was received from passenger traffic the sum of ............... $1,065,502 94

" And from freight traffic the sum of ..................... 2,160,180 23

" From miscellaneous sources ... 2,655 00

" Total ............................ $3,228,338 17

" 8th. That defendant's operating expenses for the year 1888 were .................. $2,404,516 54

" The interest paid on its bonds was ..................... 661,335 36

" Other necessary expenses, including interest on part of the unfunded debt, rental of cars, tracks, &c. ........... 150,305 61

$3,216,157 51

" 9th. That, in addition to the foregoing expenses, defendant paid during the year 1888, from its earnings, on account of interest on bonds not paid in previous years   12,257 94

" $3,228,415 45 "

In addition to this agreed statement of facts two witnesses were called, one the traffic manager and the other the treasurer of the plaintiff in error. Their testimony was substantially that, in view of the competition prevailing at Chicago, for through business, it was impossible to increase the freight rates then charged by the company, because it would throw the volume of business into the hands of competing roads. Upon such agreed statement and testimony, and that alone, the railroad company asked an instruction that the act of 1889, referred to, was unconstitutional. The court refused this instruction, and an exception to the refusal to give this

instruction was the solitary one taken on the trial. The court proceeded to charge the jury that the act in question was valid, and that the plaintiff was entitled to a verdict and judgment by reason of the failure of the defendant to comply with its provisions. To this charge no exceptions were taken, and the case went to the Supreme Court of the State on the single exception above stated. That court sustained the ruling of the trial court, and affirmed its judgment, 83 Michigan, 592; to reverse which judgment, the railroad company sued out a writ of error from this court.

Mr. *George F. Edmunds* for plaintiff in error. Mr. *E. W. Meddaugh* was on the brief.

Mr. *A. A. Ellis*, Attorney General, of the State of Michigan, on behalf of the State, for defendant in error.

Mr. *William T. Mitchell*, for defendant in error, submitted on his brief.

MR. JUSTICE BREWER delivered the opinion of the court.

The single question presented on the record is, whether the trial court, on the facts presented, erred in refusing to instruct, as a matter of law, that the act of 1889 was unconstitutional. It will be noticed that that act does not interfere with the rates of freight; it simply regulates passenger fares; also, that there was no agreement that the freight rates could not be so changed as to increase the revenues therefrom. There was in evidence the opinion of two gentlemen, doubtless well informed and worthy of credit, that an increase of freight rates was inexpedient and futile, and would tend to diminish rather than increase the income from freight. But the question was not submitted to the jury as to whether they believed that an increase of freight rates would work a reduction of the income from freight, nor even whether they believed that a reduction of the passenger tariff between Battle Creek and Port Huron would not so increase the travel as to increase the earnings therefrom; but the court was asked

to peremptorily charge the jury that the law fixing the passenger rate was unconstitutional. In other words, the instruction asked amounted to this, that, as matter of law, the opinion of these two witnesses as to the effect of raising the freight tariff upon the earnings was conclusive; that, as like matter of law, the reduction of passenger tariffs would not so increase the amount of passenger business as to increase the revenues, but would, on the contrary, diminish the earnings therefrom; that such reduction would operate to so far diminish the earnings of the road as to prevent the payment of operating expenses and fixed charges; and, therefore, that the act was unconstitutional in its application to this company; or else, that the legislature had no power in respect to the matter, and that an act prescribing maximum rates was necessarily unconstitutional, although the rates authorized might be so high as to enable every company to pay therefrom all expenses and large dividends to stockholders.

In this connection it is worthy of note that while, by the agreed statement, the previous passenger rate between Port Huron and Battle Creek was $4.80, which was the same rate per mile that defendant uniformly charged all other persons for transportation upon its road, yet from the report of the defendant, made to the State of its business for the year 1888, and which we are invited by its counsel to examine, it appears that the average rate of fare per mile for all passengers was $.0162, being .0038 less than the maximum rate fixed by the act in question.

Can it be, under these circumstances, that the court erred in peremptorily refusing to instruct the jury that an act fixing a maximum rate at two cents per mile is unconstitutional? Is the validity of a law of this nature dependent upon the opinion of two witnesses, however well qualified to testify? Must court and jury accept their opinions as a finality? Must it be declared, as matter of law, that a reduction of rates necessarily diminishes income? May it not be possible — indeed, does not all experience suggest the probability — that a reduction of rates will increase the amount of business, and, therefore, the earnings? At any rate, must the court assume

that it has no such effect; and ignoring all other considerations, hold, as matter of law, that a reduction of rates necessarily diminishes the earnings? If the validity of such a law in its application to a particular company depends upon a question of fact as to its effect upon the earnings, may not the court properly leave that question to the jury and decline to assume that the effect is as claimed? There can be but one answer to these questions. If the contention be that the legislature has no power in the matter, and that an act fixing rates, however high they may be, is necessarily unconstitutional, it is enough to refer to the long series of cases in this court in which the contrary has been decided. The legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates. *Stone* v. *Farmers' Loan & Trust Company*, 116 U. S. 307; *Chicago, Milwaukee &c. Railway* v. *Minnesota*, 134 U. S. 418.

The Supreme Court of Michigan in passing upon the present case, felt constrained to make this observation :

"It being evident from the record that this was a friendly suit between the plaintiff and the defendant to test the constitutionality of this legislation, the attorney general, when it was brought into this court upon writ of error, very properly interposed and secured counsel to represent the public interest. In the stipulation of facts or in the taking of testimony in the court below neither the attorney general nor any other person interested for or employed in behalf of the people of the State took any part. What difference there might have been in the record had the people been represented in the court below, however, under our view of the case, is not of material inquiry."

Counsel for plaintiff in error, referring to this, does not question or deny, but says : "The attorney general speaks of the case as evidently a friendly case, and Justice Morse, in his opinion, also so speaks of it. This may be conceded ; but what of it? There is no ground for the claim that any fraud or trickery has been practised in presenting the testimony."

We think there is much in the suggestion. The theory upon which, apparently, this suit was brought is that parties

have an appeal from the legislature to the courts; and that the latter are given an immediate and general supervision of the constitutionality of the acts of the former. Such is not true. Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, State or Federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act.

These observations are pertinent here. On the very day the act went into force the application for a ticket is made, a suit commenced, and within two months a judgment obtained in the trial court; a judgment rendered not upon the presentation of all the facts from the lips of witnesses, and a full inquiry into them, but upon an agreed statement which precludes inquiry into many things which necessarily largely enter into the determination of the matter in controversy. A single suggestion in this direction : It is agreed that the defendant's operating expenses for 1888 were $2,404,516.54. Of what do these operating expenses consist? Are they made up partially of extravagant salaries; fifty to one hundred thousand dollars to the president, and in like proportion to subordinate officers? Surely, before the courts are called upon to adjudge an act of the legislature fixing the maximum passenger rates for railroad companies to be unconstitutional, on the ground that its enforcement would prevent the stockholders from receiving any dividends on their investments, or the bondholders any interest on their loans, they should be fully advised as to what is done with the receipts and earnings of the company; for if so advised, it might clearly appear that a

prudent and honest management would, within the rates prescribed, secure to the bondholders their interest, and to the stockholders reasonable dividends. While the protection of vested rights of property is a supreme duty of the courts, it has not come to this, that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries, or in some other improper way; transfer its earnings into what it is pleased to call "operating expenses."

We do not mean to insinuate aught against the actual management of the affairs of this company. The silence of the record gives us no information, and we have no knowledge outside thereof, and no suspicion of wrong. Our suggestion is only to indicate how easily courts may be misled into doing grievous wrong to the public, and how careful they should be to not declare legislative acts unconstitutional upon agreed and general statements, and without the fullest disclosure of all material facts.

*Judgment affirmed.*