April 3,
 1923.

### PLYMOUTH ELECTRIC LIGHT COMPANY *v.* STATE.

The rates allowed by the commission are not competent evidence of the value
   of the property for the purpose of fixing rates.
Under Laws 1913, *c.* 145, *s.* 22 (e), an order of the public service commission
   fixing rates will not be revised by the supreme court unless it is satisfied by
   a clear preponderance of the evidence that the rate fixed by the commission
   is unjust or unreasonable.
Upon a rehearing by the public service commission of its order "reducing the
   lighting rate to a certain price per kilowatt hour . . . This schedule will
   continue until reason is found for a change," the commission under Laws 1911,
   *c.* 164, *s.* 11 (d) may fix a lower maximum rate where it expressly appears in
   the earlier order that such price was fixed as an experimental rate for a
   limited period which had expired.

APPEAL, from an order of the public service commission, revoking
prior orders and limiting the maximum rate to be charged by the
appellant for domestic lighting. The order was dated January 27,
1922, this appeal was filed March 7, 1922, and the questions in issue
were submitted upon argument at the January term, 1923. The
facts appear in the opinion.

*Demond, Woodworth, Sulloway & Rogers* and *Alvin F. Wentworth*
(*Mr. Sulloway* orally), for the appellant.

*Jewett & Jewett* (*Mr. Stephen S. Jewett* orally), for the town of
Plymouth.

SNOW, J. The appellant, hereinafter referred to as the company, is
a public service corporation engaged in the generation, distribution

and sale of electric current for domestic and municipal lighting and power in the village of Plymouth. The company's appeal, so far as relied upon in argument, is from that part of the commission's order which limits rates for domestic lighting. On October 1, 1920, upon the request of the company, the public service commission granted the company the right to charge a maximum rate of 25 cents per kilowatt hour for domestic lighting with a minimum charge of $2.00 per month. This was an emergency measure to meet the exceedingly high cost of coal. Upon the passing of that emergency, at the request of the commission, the company, on April 1, 1921, voluntarily reduced the rate to 20 cents per kilowatt hour, but declined to make any further reduction. Upon complaint from individual consumers, the commission, upon its own motion, made an investigation of the reasonableness of the rates, and, after several days' hearing, at which the parties appeared without counsel, issued an order on April 30, 1921, fixing the maximum rates at 18 cents per kilowatt hour with a minimum charge of $1.50. Upon motion of the company, a rehearing was granted. Hearings covering several days were held in July and November, 1921, and in January, 1922. In the meantime, the order of April 30, 1921, was suspended. Following the submission of the issue, the commission on January 27, 1922, filed an exhaustive report of its findings, and issued an order effective February 1, 1922, fixing the maximum rate for domestic lighting at 16 cents per kilowatt hour with a minimum charge of $1.50. The appeal, while in form from an order denying a further motion for rehearing, is in effect an appeal from the foregoing order, and raises (1) the question of the jurisdiction of the commission to lower the 18 cent rate on the company's motion for a rehearing and (2) the question of the sufficiency of the 16 cent rate to afford the company a fair return on the fair value of its property devoted to the public use.

Laws 1911, *c.* 164, *s.* 11 (d) provides that "the charges allowed by it [the public service commission] to be charged by any public. utility shall be the rates . . . to be charged . . . by the public utility affected by the order of the commission fixing the same for such period of time not exceeding two years, as shall be prescribed in the order of the commission, unless the same shall be suspended or set aside by a court of competent jurisdiction." The company contends that the order of April 30, fixing the 18 cent rate, was unconditional, and under the terms of the statute, in the absence of any appeal, was binding upon both parties for a period of two years; that upon the company's motion for a rehearing based upon the

claim that the rates were too low, the commission was without jurisdiction to further lower the 18 cent rate, which it claims had become *res adjudicata* as to the consumers.

If it were possible to construe the statute as imposing such a restriction upon the powers of the commission, which has not been considered, a sufficient answer to the company's contention is found in the terms of the commission's order. The report of the commission of April 30, which, by the terms of the order of that date, was "made a part" thereof, states "it was deemed best to determine a fair schedule of rates for the six months from April to September, inclusive, in the hope that more settled business conditions and improvements in operating methods may then make feasible a more permanent schedule . . . It is thought that this may be done by revising the present schedule by reducing the lighting rate to 18¢ per kilowatt hour and the minimum charge in the lighting rate to $1.50 per month . . . This schedule will continue until reason is found for a change." It is clear that, by its order of April 30, the commission was merely fixing temporary rates, pending the stabilizing of business conditions and improvements in methods of operation. The order by the reference to the report provided for its own limitation. The order of April 30, 1921, therefore, presented no barrier to the order of January 27, 1922, which did not become effective until February 1, or more than nine months after the earlier order. That the commission and also the company understood, at the inception of the rehearing, that the question to be tried was not confined to a consideration of a possible increase, to the exclusion of the question of a possible decrease, of rates is evident (1) from the announcement of the commission that the "hearing is called for the purpose of determining reasonable and lawful rates to be established" and (2) the statement of counsel in his opening that "this is a rehearing on the question as to what is a reasonable and lawful rate to be charged."

The company's second ground of appeal is based upon the claim that the 16 cent rate with a minimum charge of $1.50 is inadequate to yield a fair return upon the fair value of its property devoted to public use. The error complained of is in the findings of the essential facts upon which the commission based the rates, viz., (1) the value of the company's property and (2) the amount allowed for operating expenses, taxes, depreciation and return.

The commission has found that the fair value of the company's property for rate-making purposes is $35,000. The company attacks

this finding on the grounds that the commission (1) gave too great weight to the testimony of the town's expert witness as to the extent of the obsolescence of the company's plant, (2) did not give due weight to present-day values, and (3) failed to give due weight to a contract of the company with one Lothrop for the sale of its plant, made November, 1921, to take effect as of January 1, 1922.

At the original hearing, the evidence of value before the commission was a valuation of $20,570.16, made by an expert for the company in 1912, a valuation of $23,977.54, made by an engineer for the commission in April, 1917, and the book value, viz., what the company carried as its plant value on its books, of $25,082.69 as of December 31, 1920. Upon this evidence the commission, in determining the rates in its earlier orders, had assumed $25,000 to be a fair value for the rate base. The company submitted no evidence of the actual cost of the property, and it was conceded that the cost could not be determined from its books. The commission, in arriving at the fair value of the property, had, therefore, to rely principally upon the uncertain estimates of experts employed by the respective parties.

It seems to have been conceded that the rate base should be the depreciated value. The estimates submitted in each case were accordingly of the reproduction value of the property less depreciation. The company's expert, whose estimate was submitted first, assumed as a basis of reproduction values, the average unit prices for a three-year period ending October 1, 1916, less depreciation as of June 1, 1921. On this basis, he estimated the cost of reproduction at $49,725 and the value less depreciation of $40,948.50. Following the submission of his testimony and estimate, the company's expert, upon conference with the commission's former accountant, who had submitted the valuation of $23,977.54 in 1917, agreed with the accountant upon a depreciated value of $37,359. The same unit prices were used, and allowance was made for the additions to the plant since the date of the accountant's earlier valuation. The town's expert, adopting the unit values which had been assumed by the company's expert, submitted an estimate of reproduction cost of $35,135 and a depreciated value of $24,010. While the experts representing the opposing interests were thoroughly competent and of high standing, the wide difference in the results reached led the commission to the "irresistible conclusion that each was not unmindful of his client's interest." Such a divergence of opinion was made possible by the condition and state of repair of the property. While the service

rendered to the public appears to have been fairly satisfactory, the plant was thirty years old, and operated by a steam engine, which was installed in 1906–1907. One-half of the generators in use were of the direct-current type and admittedly antiquated. With the change to alternating current, which is in progress and to be completed presently, not only the generators but the direct-current meters are of small market value. The renewal of poles and of some of the other appliances appears not to have kept pace with the usual improvements to be expected in plants of this character. The want of reserve equipment to insure continuous service, the inadequacy of the present buildings to house additional equipment, the primitive methods of handling coal, and the dependence of the plant upon town water were factors adversely affecting the market value of the plant. While in many other respects the plant appears by the evidence to have been kept up to date and in a state capable of giving good service, enough has been said to justify a large allowance from reproduction cost because of age, obsolescence and use. The disagreement of the experts in valuations was due to a large extent to the difference in their estimates of the values of old, obsolete and worn equipment. Each expert was permitted to examine the other at length as to the basis of his estimates, and each supported his views by well-considered reasons. Upon careful review of the testimony, the court is not satisfied that it clearly appears that the commission was not justified in its conclusion that the methods of the town's expert in arriving at true values comes nearer being correct than that adopted by the company's expert.

The company's complaint that the commission did not give due weight to present-day values is founded upon a second estimate of plant value made by its expert, based upon present-day values, in which he found the reproduction cost, without allowance for overhead, $56,701, and the depreciated value $46,276. While costs are admittedly higher than during the three-year period (1914–1916) adopted as the basis of unit values, the uncertainty of the permanence of present-day values is such that it would be unfair to the public to adopt them unreservedly in the estimate of equipment purchased at pre-war prices and still remaining in service. The fact that the company's expert selected the unit values of 1914–1916 as the basis of his estimate, upon which the company principally relied, is a recognition of the justice of this view. The commission appears to have adopted a reasonable rule in seeking a mean between the present and pre-war values, so far as the property

is up to date, and in giving to the obsolete equipment a value not far in excess of what it would bring when replaced by new equipment. The substitution of new or improved machinery and appliances in the place of the old, when actually installed, will entitle the company to consideration as respects plant value if it should appear that the cost is substantially in excess of that adopted as the unit basis in determining the value found.

The company places much weight upon the Lothrop contract as evidence of value. The price named in the contract was $45,000, which was based upon a physical value of $40,000 plus a "going concern" value of $5,000. "When property such as this, not subject to ordinary sale, is sold privately with no competition, the sale furnishes only the opinion of the seller and the purchaser as to value, given under circumstances entitling it to consideration but by no means to be regarded as conclusive." *Grafton County Elec. &c. Co. v. State*, 78 N. H. 330, 335. The opinion of the owners, as evidenced by their contract of sale to Lothrop, might well be accepted as valuable evidence that the price agreed upon was adequate. This is justified because of their presumed knowledge of the property, acquired by twenty years' ownership and management. The prospective purchaser qualified upon the witness stand as a man of large experience in handling similar properties, but the evidentiary worth of his opinion of the value of the property necessarily depended upon the data upon which he exercised his matured judgment. While he stated that he had made an examination of the plant, it was very evident from his testimony that his personal examination had been superficial and that in making his offer he had relied principally upon an appraisal made by the company's expert, and had also been influenced in no small degree by the past earnings of the company. As the company's expert had testified fully upon direct and cross examination as to the basis and details of his appraisal which had been submitted as the principal basis of the company's claim to increased rates, it is apparent that to the extent that Lothrop's opinion, as expressed in his offer, was based upon the appraisal of the expert, it merely reflected the latter's opinion, and therefore added nothing to the value of the evidence already before the commission. To the extent that the offer was based upon past earnings, it could have no evidentiary value since the rates allowed by the commission are not competent evidence of the value of the property for the purpose of fixing rates. *Grafton County Elec. &c. Co. v. State*, 77 N. H. 539, 543.

For the foregoing reason it does not clearly appear from the record that the commission was in error in fixing the fair value of the company's property for rate-making purposes.

But the company contends that the 16 cent rate (with a minimum of $1.50) is inadequate to yield a fair return on the established value of $35,000. This rate is based upon a finding of the commission that the company was entitled to charge prices that would yield an annual revenue of $24,520 to take care of the following items, viz., operating expenses, including taxes, $20,000; depreciation, $1,400, being 4 per cent on the plant value of $35,000; and a fair interest return, $3,120, being 8 per cent on the plant value plus $4,000 allowed for working capital. The complaint is as to the inadequacy of the allowance of $20,000 for annual operating expenses, including taxes. In support of its contention, the company submitted, through its expert, a statement entitled "actual operating expenses 1920," which purports to be based upon the books and records of the company. This statement represents that the annual expense for that year was $24,770.66. Allowing for the difference in the price of coal, the expert computes therefrom a probable operating expense for 1921 of $24,373.66.

It must be conceded that the actual operating expense of a utility, as shown upon its books, kept according to approved methods of accounting, constitutes valuable though not conclusive evidence of the requirements of the utility. Had such accounts been kept, the solution of the question under discussion would have been simple. Under Laws 1911, c. 164, s. 6, as amended by Laws 1913, c. 98, s. 1, the commission is authorized to establish a system of accounts and records to be used by public utilities, and to prescribe the manner in which they shall be kept. When the commission has prescribed the form of accounts and records to be so kept, the statute requires that the utility "shall thereafter keep the accounts and records so prescribed accurately and honestly and in the manner prescribed," and further that "it shall be unlawful for any such . . . public utility to keep any other accounts or records covering the matters included in the accounts and records prescribed . . ." The statute requires that "every public utility shall carry a proper and adequate depreciation account" when so required, conformable to the rules and regulations prescribed by the commission. The evidence shows and it appears to be conceded that the company had persistently, and for no sufficient reason, neglected to keep accounts according to the classification which had been prescribed

for it by the commission, notwithstanding that its failure to do so had been repeatedly called to the attention of the managers of the company since 1915. The books, as kept, fail to distinguish accurately between expenses of operation, depreciation and expenditures for construction. The book-keeping situation is complicated by the fact that the managers and principal owners of the utility have owned and operated a merchandise and jobbing business and carried on an insurance business in connection with the utility. The time of the manager and treasurer and of some of the employees has been employed interchangeably in the different enterprises, and no accurate segregation of their time and expenses has been made. No attempt has been made to apportion certain of the general expenses of the joint enterprises. The annual statements of the company to the commission, made up from the books, are declared by its expert to be worthless. In reaching his conclusion as to the so-called "actual operating expenses 1920," the company's expert undertook from the books, as kept, with the aid of other available data, to analyze the entire cash expenditure for the year 1920, and to separate the expenses of the merchandise and jobbing business and the insurance business from those of the utility and to distribute the latter to the proper utility accounts. He included such items as he considered should be properly chargeable to operating expenses, and discarded items which he regarded as improperly so charged. His computation necessarily involved some estimates and assumptions, particularly as to the equitable division of burdens as between the respective enterprises and accounts.

The company's expert, at the request of the commission's accountant, submitted to the commission the details of this computation, following which the latter presented a detailed and elucidated statement, comparable with the company's computation, entitled a "revised estimate of normal operating expenses," which he found to be $18,658.10. The relative value in evidence of these computations and estimates, so far as they were in conflict, was tested by an exhaustive cross-examination of the accountant by the company's expert.

This examination disclosed that the company's computation of annual expenses included, under the head of "operating expenses," about $700 expended in repairs upon the antiquated direct-current generators, or approximately one-half of the cost of a new alternating current generator, sufficient to carry the full load of the plant, an expense which should have been charged chiefly to depreciation; that he charged to "distribution" expenses of labor in the amount

of $1,700, which should fairly have been apportioned between the accounts of the merchandise and jobbing business, construction and depreciation reserve. The accountant's view as to the excessive charges in this regard was supported by the testimony of the town's expert, who testified that the total distribution expense claimed by the company's expert would be sufficient to reset all the wires, set all the poles and put in all the meters of the company each year. The further main differences between the computations have to do principally with the ratio of division adopted in apportioning between the three enterprises the items of salaries, office and general expenses, including taxes and insurance.

In the absence of definite and authoritative data upon any given expense allotted to operation, the accountant, in his estimates of the company's normal operating expenses, gave weight to the known operating expenses of other like utilities, similar in size and location. While such comparative estimates are at most approximate, and to an extent unreliable, the company is not in a position to complain, since the necessity of resorting to the less satisfactory evidence is due to its inability by reason of its own neglect to furnish better evidence. Such a comparison discloses that the amount of the supposed "actual operating expenses" computed by the company's expert is excessive in proportion to that of other like companies and all out of proportion to the total valuation of the property.

The company has, under the requirements of the order of April 30, 1921, filed with the commission monthly reports showing the amount of the revenue actually received under the lighting rates prescribed. Upon the basis of the actual receipts so reported for the months of June to November, 1921, the revenue which would have been received for the same period under the 16 cent rate (with $1.50 minimum) was computed and found to be $12,514.30. This is at the annual rate of $25,028.60, or $508.60 in excess of the annual requirements of the company of $24,520 as fixed by the commission's finding. It is believed that experience will justify the estimate of the commission that the actual receipts of the year will be found to exceed double the amount received for the six months taken as a basis for computation, in which event the 16 cent rate, when put into effect, will yield a revenue considerably in excess of the annual requirement of $24,500.

It has not been deemed necessary to discuss all the evidentiary findings of the commission upon the points raised by counsel in argument. What has been said is deemed a sufficient statement of the reasons underlying the conclusion reached by the court. The

court is not satisfied by a clear preponderance of the evidence before it that the order of the commission is unjust or unreasonable. Laws 1913, c. 145, s. 22 (e).

                                        *Appeal dismissed.*

YOUNG, J., was absent: the others concurred.