## McCART ET AL. *v.* INDIANAPOLIS WATER CO.

No. 90.   Argued December 15, 1937.—Decided January 3, 1938.

*Mr. Urban C. Stover,* with whom *Messrs Floyd J. Mattice, Edward H. Knight* and *James E. Deery* were on the brief, for petitioners.

*Messrs. William L. Ransom, Joseph J. Daniels* and *G. R. Redding* were on the brief for respondent.

PER CURIAM.

This suit was originally brought by the Indianapolis Water Company to restrain the enforcement of an order of the Public Service Commission of Indiana fixing a temporary schedule of rates pending the Commission's investigation. The District Court of three judges (28 U. S. C. 380) denied an interlocutory injunction and the temporary rates became effective. The Commission on

December 30, 1932, adopted a different and permanent schedule of rates to be effective January 1, 1933. The Company then filed an amended and supplemental bill assailing those rates as confiscatory and invoking the Fourteenth Amendment of the Constitution of the United States. An interlocutory injunction was not sought and the case was properly heard in the District Court by a single judge. *Indianapolis Water Co.* v. *McCart,* 13 F. Supp. 107; *Smith* v. *Wilson,* 273 U. S. 388; *Stratton* v. *St. Louis Southwestern Ry. Co.,* 282 U. S. 10; *Healy* v. *Ratta,* 289 U. S. 701. Pursuant to the Commission's final order, the Company filed the schedule of rates as prescribed, and these rates went into effect on January 1, 1933, and under that order have since been in effect without limitation of time.

The Commission found that the fair value of the Company's property as of November 1, 1932, was not less than $22,500,000 and that the income under the new rates would be "approximately $1,400,000, or a return slightly in excess of six per cent" on that amount. The District Court appointed a Special Master, who received evidence between May 1, 1933, and August 10, 1933, and held a further and reopened session on October 18, 1933, when the hearing of evidence was closed. On April 18, 1934, the Master offered to receive evidence as to the actual operations of the Company for 1933 but the respective parties informed the Master that they did not desire to offer any such testimony. The Master filed his report on May 18, 1934. The appraisals before the Master were made as of April 1, 1933. He found the fair value of the Company's property to be $20,282,143 as of that date and also as of the time of filing his report. He estimated and found that the income applicable to return for the year 1933 and for a reasonable time thereafter would be $1,294,566.51. He concluded that the rates were not confiscatory.

After a hearing upon exceptions to the Master's report, the District Court entered a final decree on November 29, 1935, dismissing the amended and supplemental bill of complaint. 13 F. Supp. 110. The court found that the value of the Company's property was $21,392,-821 as of April 1, 1933, and although the evidence of value had been addressed to that date, the court went further and found in its decree that this amount "was the fair and reasonable value thereof as of the time of filing the report of the Special Master herein and as of the date of these findings and that such value will continue to be a fair and reasonable value of the plaintiff's used and useful property for a reasonable time in the future." The court adopted the finding of the Master that the income would be not less than $1,294,-566.51 for the year 1933 and for a reasonable time thereafter.

Upon appeal, the Circuit Court of Appeals, reviewing the evidence upon disputed points, found that there should be certain increases, amounting to $975,437, in the rate base, making it $22,368,258. The court observed that from April 1, 1933, the valuation date, to the date of the decree of the District Court, November 29, 1935, thirty-two months had intervened; that this period was no longer one for prophecy but had passed "from the field of speculation to one of experience"; and that experience had shown that in that period there had been "a constant and definite trend upward in commodity values." 89 F. (2d) 522, 525, 526. With respect to income, the court said that the amount found by the Master for 1933 ($1,294,566.51) was about $57,000 higher than that indicated by the testimony of any witness, but the finding was not overruled in view of the failure of the Company to take advantage of its opportunity to show the actual receipts and disbursements for that calendar year. *Id.,* pp. 527, 528. Holding that the District Court

had erred in determining in its decree that the valuations as of April 1, 1933, were applicable to the date of the decree in November, 1935, without taking appropriate account of changed conditions in the interval, the court reversed the decree and remanded the cause for further proceedings in accordance with the views expressed in its opinion. *Id.*, p. 528.

Petitioners urge that the Court of Appeals has virtually required the District Court to find confiscation. We do not think that this is the necessary import of the opinion. The appellate court took judicial notice of an upward trend in prices but did not attempt to make a specific application of that trend. The reversal of the decree requires a hearing anew in the District Court, and upon that hearing all questions pertinent to the issue of confiscation should be open. The economic changes to which the Court of Appeals has referred may affect income as well as values.

In the instant case, we do not have a situation in which rates as fixed by a Commission have been enjoined. Here the rates prescribed by the Commission's order have been in effect all through this litigation, and are now in effect. A decree for injunction could operate only as to the future. Another special circumstance is that the decree of the District Court expressly provided that the value it found was the value as of the date of the decree, November 29, 1935, although the evidence before the court related to April 1, 1933. A decree speaking as of the later date and operating thereafter should have a basis in evidence. On the hearing required by the Circuit Court of Appeals, the District Court will be able to ascertain what have been the actual results of the Company's business during the intervening years and thus to base its decree upon known conditions as to those years which may show clearly, in the light of the economic changes which have occurred, whether the prescribed rates are or

are not of a confiscatory character and whether an injunction restraining the enforcement of the rates should be granted or denied.

To leave no question as to the authority of the District Court thus fully to rehear and determine the cause the decree of the Circuit Court of Appeals is modified so as to provide that the cause is remanded to the District Court for further proceedings in conformity with the views expressed in this opinion. As thus modified, the decree of the Circuit Court of Appeals is affirmed.

*Modified and affirmed.*

MR. JUSTICE CARDOZO took no part in the consideration and decision of this case.

MR. JUSTICE BLACK, dissenting.

I cannot agree that this cause brought here by the Public Service Commission and the Attorney General of the State of Indiana should be sent back to the District Court for a new trial. After an examination of the record, I am persuaded that the action of the Court of Appeals was wrong and that its judgment should not be affirmed either as rendered or in any modified form. The importance of the questions here involved leads me to set out some of my reasons for this belief.

Six years ago (1931) the City of Indianapolis filed a petition with the Public Service Commission of Indiana against the Indianapolis Water Company, seeking a reduction of water rates for small consumers. The commission fixed the rates in December, 1932. A *master* appointed by the District Court reported that there was *no confiscation* May 18, 1934. The *District Court* held there was *no confiscation* November, 1935. The *Court of Appeals* found there *was confiscation* March, 1937. Now, January, 1938, *this Court* sends the case back to the District Court for *trial "anew."* The cause goes back to the District Court with the admonition from the Court of Appeals

that a "general and persistent rise in prices should have been given effect in fixing a fair valuation." Affirmance of the Court of Appeals' decree necessarily approves this statement and this statement requires an increased valuation of the Company's property. Experience demonstrates that rate cases continue to come to this Court until final decisions are reached. If the second trial follows the course of the first, the case should return to this Court by 1943. However, it will now be the duty of the District Court, in trying the case anew, to make a forecast as to probable commodity values covering this future period up to 1943.[1] If its forecast should be wrong, the present case will be a precedent for reversing the cause in 1943 for still another trial. Sending the case back indicates that the Court of Appeals was right in reversing the District Court.

I believe the Court of Appeals was in error, that the evidence did not show confiscation, and I cannot agree to the action of the majority. This Court has announced the doctrine that the States have full and complete rights to regulate the rates of local intrastate utilities and that the federal courts cannot and will not interfere with this regulation unless the rates are confiscatory. Furthermore, "upon that question (of confiscation) the complainant has the burden of proof and the Court may not interfere with the exercise of the State's authority unless confiscation is clearly established."[2] The judicial function does not extend beyond the decision of the constitutional question. Unless, therefore, the water company satisfactorily overcame the presumption that the rate set by the commission is not confiscatory, this Court should not invade the constitutional sphere of state rate regulation.[3]

---

[1] *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 408, 409.

[2] *Los Angeles Gas Co.* v. *Railroad Commission*, 289 U. S. 287, 305.

[3] *Chicago & G. T. Ry. Co.* v. *Wellman*, 143 U. S. 339.

I cannot say that the evidence in the District Court "compelled a conviction that the rate would prove inadequate"; [4] or that the rates were "palpably and grossly unreasonable"; [5] nor was the evidence sufficient to overcome the presumption that the rates, as fixed by the commission and reinforced by the judgment of the master and the District Court, were not confiscatory. [6]

The master reported the value of the Company's property to be $20,282,143.00 as of April 1, 1933. December, 1935, the District Court after a review of the evidence and the report of the master, refused to enjoin the enforcement of the rates fixed by the commission. That court excluded from consideration for rate making purposes a group of farms owned by the Company and estimated by the master to have a value of $264,050.00, but increased the master's estimate of the value of "water rights" to $500,000.00. Evidence having been given of the "reproduction value" of the Company's property, the District Court increased by $1,333,333.00 the master's "estimate" of the "estimated cost" of labor necessary to "reproduce" the Company's property; it raised the master's total "estimate" of this wholly imaginary reproduction from $20,282,143.00 to $21,392,821.00.

*March 23, 1937*, six years after the City of Indianapolis had originally initiated its efforts to obtain a reduction in water rates, the Court of Appeals reversed and remanded this cause. In doing so, it ordered that the Company's Indiana farms be included in the total valuation upon which the people of Indianapolis must pay the Company an income; added $361,308.00 to the "estimate" of the master and District Court for "undistributed construction costs"; and raised "going value" $250,079.00.

---

[4] *Galveston Electric Co.* v. *Galveston*, 258 U. S. 388, 401.

[5] *San Diego Land Co.* v. *National City*, 174 U. S. 739, 750.

[6] *Darnell* v. *Edwards*, 244 U. S. 564, 569.

The principal reason given for the reversal, however, was that general price levels had risen, during the thirty-two months intervening between the date at which valuations were fixed (April 1, 1933) to the date of the District Court's decree (November 29, 1935). Looking at price index figures, the Court of Appeals decided that prices had ascended about twenty-five per cent. during that period, and that if the District Court had given proper consideration to this increase in determining the value of the Company's property, that court would have found that the rate fixed by the commission was "clearly confiscatory."

One month and three days, however, after the price index method had been used by the Court of Appeals in finding the Indianapolis water rates confiscatory, this Court, in the case of *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n*, 301 U. S. 292, struck down a reduced telephone rate fixed by the Ohio Public Service Commission. The people of Ohio were deprived of the benefit of a reduced telephone rate because the decision of the Public Service Commission rested upon price indices. Yet, if the District Court follows the opinion of the Court of Appeals which is here affirmed, the people of Indianapolis will be deprived of a reduced water rate because a price index, not introduced in evidence, indicated to the Court of Appeals that the valuation fixed by the District Court was wrong. This opinion of the Court of Appeals as to value is not repudiated by the affirmance. The majority does not reverse the Court of Appeals' finding of confiscation.

I cannot agree that the District Court should be reversed for failure to prophesy the exact future course of commodity prices. The *legal* knowledge of few judges is such that they can accurately foresee and forecast all price fluctuations. In the delays incident to rate litigation it is probably true that prices will fluctuate many

times between the beginning of a litigation and the time when the cause is won, lost or abandoned.

It has now been more than five years since the commission fixed a valuation for this water works property and it has been more than four years since the master reached his conclusion. If it requires four more years for this case to return to the Court of Appeals, there can be no doubt but that some price index can be found to show other changes in prices. Such a result will add still further to the confusion and chaos of judicial rate making. I believe it forecasts a day when the present long delays in rate regulation will be endless.

The City of Indianapolis should not be subjected to another trial unless this Court believes the rates to be confiscatory. When the District Court tries the case anew it will be constrained to follow the decision of the Court of Appeals that a "general and persistent rise in prices should have been given effect in fixing a fair valuation." In the meantime, can a judge be found who can accurately divine all future prices of commodities to be used for imaginary reproductions of this Company's property?

I believe this cause should be brought to a conclusion at this time.[7] My belief that the Court of Appeals should be reversed is strengthened by a study of the record in the case of *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, of which record we take judicial notice.[8]

For the first hundred years of this Nation's history, federal courts did not interfere with state legislation fixing maximum rates for public services performed within the respective states. The state legislatures, according to a custom which this Court declared had existed "from time immemorial"[9] decided what those maximum rates should

---

[7] See *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 16; also *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 420.

[8] *National Fire Ins. Co.* v. *Thompson*, 281 U. S. 331, 336.

[9] *Munn* v. *Illinois*, 94 U. S. 113, 133.

be. This Court also said that "for protection against abuses by legislatures the people must resort to the polls, not to the courts." [10] It was not until 1890 that a divided court finally repudiated its earlier constitutional interpretation and declared that due process of law requires judicial invalidation of legislative rates which the courts believe confiscatory.[11] The dissenting Justices adhered to the long existing principle that regulation of public utilities was a "legislative prerogative and not a judicial one." [12]

From this decision in 1890, *supra,* has come the doctrine that the federal courts have jurisdiction to determine whether a rate fixed by a state for a purely local utility is confiscatory. This doctrine does not purport to give to federal courts more than the limited jurisdiction to determine whether a given state rate is so low as to be confiscatory.

The determination by the Court of Appeals that the rates in the present case are confiscatory can only be supported, if at all, by giving undeserved weight to evidence given to support the "reproduction cost" theory. The experience of the people of Indianapolis in their efforts to obtain fair and reasonable water rates from this company which has long had a monopoly in their community, discloses what appears to me to be the complete unreliability of the "reproduction cost" theory. Wherever the question of utility valuation arises today, it is exceedingly difficult to discern the truth through the maze of formulas and the jungle of metaphysical concepts sometimes conceived, and often fostered, by the ingenuity of those who seek inflated valuations to support excessive rates. Even the testimony of engineers, with wide

---

[10] *Id.,* p. 134; see *Peik* v. *Chicago & N. W. Ry. Co.,* 94 U. S. 164, 178.

[11] *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418.

[12] *Id.,* Bradley, J., dissenting, 461.

experience in developing this theory and expounding it to courts, is not in agreement as to the meaning of the vague and uncertain terms created to add invisible and intangible values to actual physical property. *Completely lost in the confusion of language—too frequently invented for the purpose of confusing—commissions and courts passing upon rates for public utilities are driven to listen to conjectures, speculations, estimates and guesses, all under the name of "reproduction costs." In the testimony of professional witnesses employed by the litigants, courts listen to guesses about "going value"; "undistributed construction costs"; "water rights." [13] This Court has even said, "Reproduction value, however, is not a matter of outlay, but of *estimate*, and . . . proof of actual expenditures originally made, while it would be helpful, is not indispensable." [14] [Italics added.] Courts have gone further and further away from considering cost in determining the value of utility property. The cost of this Company's property apparently was given little weight

---

[13] Compare:

". . . and the conclusion of the court below rested upon *that most unsatisfactory evidence, the testimony of expert witnesses employed by the parties." Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, at 18;

"While the experts representing the opposing interests were thoroughly competent and of high standing, the wide difference in the results reached led the commission to the 'irresistible conclusion that *each was not unmindful of his client's interest.'" Plymouth Electric Light Co.* v. *State,* 81 N. H. 1, 4; 120 Atl. 689.

"*To these perturbing tendencies, all operating to weaken the persuasive force of their (expert) opinions, there must be added still another, that of interest or bias, conscious or unconscious." Dayton Power & L. Co.* v. *Public Utilities Comm'n,* 292 U. S. 290 at 299;

" '*Skilled witnesses come with such prejudice on their minds that hardly any weight should be given to their evidence.'" Appleton Water Works Co.* v. *Railroad Comm'n,* 154 Wis. 121, at 154; 142 N. W. 476. [Italics added.]

[14] *Ohio Utilities Co.* v. *Public Utilities Comm'n,* 267 U. S. 359, 362.

in previous litigation which came to this Court.[15] This Company's property was valued by this Court at $19,000,-000.00 in the prior litigation although the commission's valuation was $16,495,000.00. It is interesting to note what this property valued at $19,000,000.00 actually cost.

The record in the *McCardle* case, *supra,* showed: that the property was bought at a judicial sale in 1881 by the present Company at a cost of not more than $535,000.00, the purchase being financed by a sale of bonds; that apparently no cash was paid for the $500,000.00 face value of stock issued at that time; that the maximum book value of the Company's assets on December 31, 1923, was $9,195,908.00 but a witness called by the commission testified that the Company's records disclosed the actual book value of the property used for the public *convenience* to be only $7,967,649.00; that from 1881 to December 31, 1923, stockholders' average annual net profits were $189,255.00; that practically all of the added book value was the result of additional investments financed by borrowing and not by investment by stockholders; that no other investment was made by the stockholders in the Company since 1881, but in 1909 a write-up of $5,556,-071.85 was made on the books by virtue of which a common stock dividend of $4,500,000.00 was declared in 1910, making the total common stock $5,000,000.00; that the $5,000,000.00 stock was thereafter carried on the books of the Company; that the stockholders not only paid no additional money for stock, but that the profits made by the Company between 1881 and 1932 were not reinvested in the Company but were substantially all drawn out in dividends.[16]

---

[15] See *McCardle* v. *Indianapolis Water Co., supra.*

[16] The books of the company indicate that the company spent for additions between 1881 and December 31, 1923, $8,112,399.00 but the books also show that on December 31, 1923, the outstanding in-

This Court found in the *McCardle* case that the Company was entitled to a rate based on a $19,000,000.00 valuation as of December 31, 1923, although the record indicates: that the total actual investment made by the Company up to that time was less than $9,000,000.00 and was not stockholders' investment but was substantially all borrowed money; that the stockholders apparently had made no investment unless (which is very doubtful from the record) they paid for the $500,000.00 stock in 1881; and that the stockholders had received the following percentage of return on common stock on a $500,000.00 valuation for the five years preceding this $19,000,000.00 appraisal:

| | |
|---|---|
| 1919 | 69% |
| 1920 | 75% |
| 1921 | 88% |
| 1922 | 96% |
| 1923 | 96% |

While it is difficult to find in the present record what additional investments have been made since the $19,000,-000.00 appraisal, it does appear that the commission found

---

debtedness of the company on which it paid interest was $8,231,000.00. During the same period, from 1881 to December 31, 1923, the books showed available for dividends $8,337,232.74. Dividends paid out were as follows:

| | |
|---|---|
| Cash Dividends | $4,585,533.50 |
| Bond Dividends | 3,000,000.00 |
| Stock Dividends | 4,500,000.00 |

Total Dividends paid between
1881 and December 31, 1923.. $12,085,533.50

During the same period the record shows that interest was paid by the company on the bonds issued to the stockholders as dividends and that interest amounted to $3,076,250.00.

It thus appears from the books that the stockholders received an average of practically 38% profit on $500,000.00 from 1881 to December 31, 1923.

432

that the books of the Company showed an additional investment of $6,661,292.00. If this is added to the 1923 book value, it would appear that there is a possibility that when the appraisal in this cause was made, there may have been between $13,000,000.00 and $16,000,000.00 invested through the Company's borrowing activities. But the indebtedness kept pace with the investments and was $13,746,900.00 at this time. The District Court is now reversed, however, because the Court of Appeals found that rates based on an obviously inflated value of $21,392,821.00 fixed by the District Court would confiscate the property of the Company's stockholders.

There is a marked disparity between the actual cost of this Company's property and its imaginary "reproduction value." I shall comment upon a few of many reasons for this disparity.

First, the so-called "water rights"—The Company takes the position that water rights should have been valued at about $2,000,000.00. Expert witnesses for the city valued these rights from nothing to $75,000.00, and expert witnesses for the Company at $1,000,000.00 or more. This illustration is typical of the wide variations in expert evidence on "reproduction cost"; it is a typical "estimate." The Company claims that the element of greatest value in the water rights is the "diversion right." This "diversion right" is based, in part, on the theory that for a long number of years the Company has diverted water from the White River. According to one theory, it is claimed water which would otherwise flow down stream is diverted by the Company; that the Tom Taggart Park in Indianapolis might possibly be injured by this diversion (but the city has not complained); that the stream offers possibilities of scenic beauty if there were adequate water and if it should be made suitable for navigation by small pleasure craft. It does not appear that this formula evolved as a result of anyone's

expressed or frustrated desire to sail this stream. From the possibility, however, that the stream could be used for this purpose if imaginary people should so desire, an imaginary damage to these imaginary sailors is discovered. Based upon this potential menace to these imaginary people and their imaginary desire to use this stream, an imaginary value of $200,000.00 is suggested as the cost which the Company might incur in discharging its imaginary duty to improve the stream for these imaginary sailors.

It is difficult to believe that such concepts of property can establish clear proof that the Constitution of the United States has been violated. Nor do I believe that, even if the people of Indianapolis and the surrounding community have permitted the Water Company to use this stream for a public service, there has been a grant of a prescriptive property right which can be capitalized by the Company, in order to exact higher water rates from the very people who granted the privilege.

If the Company had made actual investments in its property between 1933 and 1935, resort to illusory property concepts would not be necessary. Clearly, it would be entitled to a reasonable return upon such actual investment. Such is not the case. The order for a new trial is not based on a claim that the Company has invested even one additional dollar. It is not claimed that the Company bought additional land; added an inch to any of its dams; extended its distribution pipes; improved its filtration system; or purchased one additional piece of property.

This Court has frequently declared that in reaching a conclusion as to a reasonable rate, the public must be considered as well as the stockholders and bondholders.[17] The doctrine against confiscatory rates is based upon

[17] See *Covington & Lexington Turnpike Co.* v. *Sandford*, 164 U. S. 578, 587; *Chicago & G. T. Ry. Co.* v. *Wellman, supra*, 346.

the theory of protecting the right of bondholders to their interest and that of stockholders to a fair return upon the value of their actual investments. While this matter has been confused by the "reproduction cost" theory, the fact remains that, as applied to corporations, it is the interest of the stockholders and bondholders which the due process clause protects.

The evidence in this case clearly establishes that the bondholders have never been, and are not now, in any jeopardy as to their interest payments. In the margin appears the record of stockholders' dividends since the $19,000,000.00 valuation.[18] In view of these dividends on this stock of uncertain cost, these stockholders were in no imminent peril because of the District Court's valuation of more than $21,000,000.00.

---

[18] Since the approval of a $19,000,000.00 valuation on this company's property was made, dividends were paid as follows:

| Year | Amount | Rate paid on inflated $5,000,000 stock valuation | Rate paid on possible $500,000 valuation |
|---|---|---|---|
| 1924 | 500,000.00 | 10% | 100% |
| 1925 | | | |
| 1926 | 600,000.00 | 12% | 120% |
| 1927 | 950,000.00 | 19% | 190% |
| 1928 | 1,000,000.00 | 20% | 200% |
| 1929 | 650,000.00 | 13% | 130% |
| 1930 | 1,225,000.00 | 24½% | 245% |
| 1931 | 600,000.00 | 12% | 120% |
| 1932 | 375,000.00 | 7½% | 75% |

"Surely, before the courts are called upon to adjudge an act of the legislature fixing the maximum passenger rates for railroad companies to be unconstitutional, on the ground that its enforcement would prevent *the stockholders from receiving any dividends on their investments, or 'the bondholders any interest on their loans, they should be fully advised as to what is done with the receipts and earnings of the company;* for if so advised, it might clearly appear that a prudent and honest management would, within the rates prescribed, secure to the bondholders their interest, and to the stockholders reasonable dividends." [Italics added.] *Chicago & G. T. Ry. Co.* v. *Wellman, supra,* 345.

This case is an illustration of the almost insuperable obstacles to rate regulation today. It involves a single Company supplying water to a single community. It does not present the difficulties of a far-flung utility system covering much territory with many separate corporate creatures. Nevertheless, this particular case has already consumed more than six years and is apparently destined to remain suspended for six more years.[19] More than 2000 pages of records and exhibits appear in this Court in the appeal.

This case was first heard by the Public Service Commission. Evidence and arguments were there introduced and the questions of value, rates, etc., were fully explored. Thereafter the Commission which had been specially created by the State of Indiana to investigate such cases rendered its decree.

Next, the case was investigated by a master in the District Court. This Court has admonished the lower court

---

[19] The following illustrate the delays in rate litigation:

| | Bill Filed | | Decided | | Time |
|---|---|---|---|---|---|
| United Fuel Gas Co. v. Railroad Comm'n, 278 U. S. 300. | Dec. | 1923 | Jan. | 1929 | 5 years |
| United Fuel Gas Co. v. Public Service Comm'n, 278 U. S. 322. | April | 1925 | Jan. | 1929 | 3 yrs. 8 mos. |
| Ottinger v. Brooklyn Union Gas Co., 272 U. S. 579. | June | 1923 | Nov. | 1926 | 3 yrs. 5 mos. |
| Ottinger v. Kings County Lighting Co., 272 U. S. 579. | June | 1923 | Nov. | 1926 | 3 yrs. 5 mos. |
| Ottinger v. Consolidated Gas Co., 272 U. S. 576. | June | 1923 | Nov. | 1926 | 3 yrs. 5 mos. |
| Patterson v. Mobile Gas Co., 271 U. S. 131. | Aug. | 1922 | April | 1926 | 3 yrs. 8 mos. |
| McCardle v. Indianapolis Water Co., 272 U. S. 400. | Dec. | 1923 | Nov. | 1926 | 2 yrs. 11 mos. |
| Average | | | | | 3 yrs. 7 mos. |

See, also, Brandeis, J., concurring, *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 88 *et seq.*

*Lindheimer* v. *Illinois Bell Telephone Co.,* 292 U. S. 151. Commission's order made 1923; cause last appeared in this Court in 1933.

*Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292. This case started before the Commission in 1921. By 1931 the Commission announced its tentative order. 1934 the Commission made what purports to be a final valuation. April, 1937, this Court returned the cause for further action.

that a master should be appointed for such purposes.[20] Extensive hearings before the master produced voluminous testimony at tremendous expense to the litigants. While this expense may appear on the books of the Company it will ultimately be borne by the consumers.

After the master heard the evidence, it went to the District Court for a third review. Thereafter it appeared in the Court of Appeals where it was again reviewed. Since it has come to this Court, I believe that the ends of justice require that it be concluded. History indicates that if it is not concluded, this is not likely to be the last journey made by the cause from Indianapolis to Washington. Litigation costs in rate regulation today constitute a heavy burden.

In the main, the dispute in this case, as in most rate cases, revolves around "intangibles" and "reproduction costs."

"Intangibles," as expounded by hired experts in rate litigations, might well be defined as "properties" that can neither be seen nor touched and which can rarely be understood. They can have little meaning when applied to property which is not for sale but for use. These property concepts are so uncertain, tenuous and elusive that no two witnesses give them the same value except on occasions when several witnesses have been employed by the same litigant.[21]

Witnesses in the present case varied as to "organization" costs from $81,000.00 to $325,000.00. Experts differed as to "going value" between $1,000,000.00 and $2,700,000.00, and on water rights from nothing to $2,000,000.00.

---

[20] *Chicago, M. & St. P. Ry. Co.* v. *Tompkins*, 176 U. S. 167.

[21] For example, in the *McCardle* case, *supra*, the highest estimate was three times as great as the lowest. See Brandeis, J., dissenting, *Missouri ex rel. S. W. Bell Telephone Co.* v. *Public Service Comm'n*, 262 U. S. at 299.

Such differences are not exceptional. They occur in most cases that have reached this Court which involve expert appraisal of such phantom concepts of property.

The estimates made by witnesses of "reproduction costs" of pipes for this water-works system strikingly illustrate this method of valuation. A Company expert estimated that the reproduction cost of the Company's "main" pipes, as of 1923, was $7,024,289.00. In this guess it was assumed that the pipe had a life of 125 years and that "as a matter of fact, it does not wear out in use." If these pipes last 125 years, the reproduction cost theory will subject the water consumers of Indianapolis to innumerable increases in the price of water during the next century. Experts can undoubtedly be found who will testify from time to time during the coming century, that the hypothetical digging up of old pipes and the hypothetical laying of hypothetical new pipes, will constantly increase the hypothetical reproduction value of pipes. In fact the actual pipes will not be dug up. They will continue to lie untouched and at rest—under the soil.

Under this reproduction cost theory, the constitutional water rate in Indianapolis must fluctuate during the next century with the price of cast iron pipes. One of the principal elements of the so-called "reproduction value" in this case is this very pipe. I do not believe that the constitutionality of action by a sovereign State of this Union is dependent upon the market fluctuations of cast iron pipe.

Testimony was given in this case as to the "reproduction cost" of a canal used by the water company. The State of Indiana constructed this canal for navigation purposes a hundred years ago. Some years after its completion, it was obtained by the Water Works Company of Indianapolis and, while the record is not clear, the price might have been as great as $35,000.00. When the

reorganization of the company occurred in 1881, this canal was placed upon the books of the present company at $50,000.00. It remained on the books at this figure until the write-up in 1909 which preceded the $4,500,-000.00 stock dividend. At that time, it was hoisted to $1,773,874.00. By 1911, this same canal apparently was carried at $2,746,538.00. In the rate valuation case in 1923, experts of the Company valued it at more than $3,000,000.00. Extensive testimony has been given in this and the *McCardle* case, *supra,* concerning the "reproduction value" of this canal. The expert who was "reproducing" the canal in 1923 "assumed a similar set of conditions to those existing at the time the canal was originally constructed." In other words, the witness took himself and his staff back a hundred years to the conditions that existed in Indiana at the time and place of the construction of this State navigation canal. Thus projecting himself back into history, he found that the water consumers of Indianapolis should pay to the present owners of the canal 6% income on more than $3,000,-000.00. I cannot subscribe to the belief that it would violate the Constitution of the United States for the State of Indiana to deny the Company 6% income on a still higher valuation of a canal that never, at the outside, cost the Company more than $50,000.00. The question in the federal courts in connection with rates is not what would be a reasonable rate to be charged by such a company, but it is limited wholly and exclusively to a decision as to whether or not a rate will confiscate the property of the company. The evidence in this case is not so "compelling" as to justify a reversal of the District Court's valuation, which valuation, itself, necessarily contains a finding of value far in excess of what this canal cost or what it is reasonably worth. In a dissenting opinion by certain commissioners of the Public Service Commission of Indiana in the *McCardle* case, they said:

"Would any reasonable man entertain the proposition of duplicating the canal, if a new water works system were to be constructed in Indianapolis? Certainly not.

"In the estimated reconstruction new cost there is the highly fancied estimate of the cost of duplicating the canal as it was constructed ninety years ago. It would be just as germane to the ascertainment of the actual value of the petitioner's property used and useful in the present water service of Indianapolis to indulge in a magnified imagination of the expense of repopulating the canal banks with the Indians."

The State of Indiana did not appeal from the judgment of the District Court. We, therefore, are not called upon to decide whether the rates now in force are so extortionate as to confiscate the property of the consumers. The Company appealed from the District Court seeking a higher valuation. The Court of Appeals decided that the Company was entitled to a higher valuation.

As a reason for reversing and remanding this cause, the majority opinion points to the fact that no interlocutory injunction has been issued. I believe that the fact that no injunction was issued after the Public Service Commission of Indiana, the master in the federal court, and the District Court had all found that the rates were not confiscatory, is but an added reason why this Court should not agree to overturn that finding and should reverse the cause. It will be wholly impossible in my judgment for any trial court to try this cause again free from the plain implication, in the action of this Court, that the value of the Company's property should be found to be approximately twenty-five per cent. greater than $22,000,000.00. How can any trial court ignore the fact that the Court of Appeals has indicated a strong belief that the value should be raised twenty-five per cent? How can any trial court escape the conclusion that an injunction should *now be issued* to prevent the enforcement of the rates that have been in effect?

There is nothing strange or unusual about the decree of the District Court fixing a value as of November 23, 1935, as well as of April 1, 1933. Any other action by the court would have gone directly in the teeth of the plain mandates of this Court in other cases. Not only was the District Court compelled to attempt to find the value as of 1933 and as of 1935, but under the opinions of this Court it was necessary that it attempt to lift the veil of the future, peer into its mysteries, and determine the value of the Company's property for a reasonable time after 1935. Its action was dictated by the command of this Court that "an honest and intelligent forecast of probable future values made upon a view of all relevant circumstances, is essential." *Missouri ex rel. S. W. Bell Tel. Co.* v. *Public Service Comm'n,* 262 U. S. 276, 288. If this language was not sufficient as an imperative admonition for the judge to become a prophet, there was the statement made by this Court in connection with the appraisal of this particular Company's property in *McCardle* v. *Indianapolis Water Co.,* 272 U. S. 400, 408, 409, that: "It must be determined whether the rates complained of are yielding and will yield . . . a reasonable rate of return *on the value of the property at the time of the investigation and for a reasonable time in the immediate future.*" [Italics added.] Surely it is not a ground for reversing the cause now that the District Court has followed these instructions. Is the majority overruling these cases? Must the District Court, when the case is tried "anew," obey the former mandates "to prophesy" or does the opinion of the majority mean it should not prophesy? If the trial court does prophesy, and human fallibility brings error into the prophecy, will this Court again six years hence, reverse and remand for another trial "anew"? I believe this affirmance adds additional uncertainty to the existing chaos of rules and formulas created by judicial pronouncement in the field of rate

litigation. I further believe it to be wrong to send this case back for another trial, because I believe the record affirmatively shows that the consumers of water in Indianapolis are already compelled to pay an unjustifiable price for their water on account of previous judicial over-valuation of this property.

I believe the State of Indiana has the right to regulate the price of water in Indianapolis free from interference by federal courts. The courts did not deny this right to the states for the first hundred years after the adoption of the Constitution.[22] But even under the comparatively recent doctrine purporting to give federal courts juris-diction to invalidate rates fixed by a state, I am of the opinion that the federal courts have no jurisdiction to proceed in this cause. I base this belief on the record which does not show clearly that the stockholders of the Indianapolis Water Company have ever made any sub-stantial investment which could be confiscated. I fur-ther believe that the evidence does not clearly establish that the rates fixed by the commission will fail to provide an income amply adequate to pay all interest on the Company's funded debt and provide far more than a 6% profit on any actual value in excess of the borrowed capital remaining unpaid. I, therefore, believe that this Court should order this cause dismissed for want of jurisdiction or that the judgment of the Circuit Court of Appeals should be reversed and the opinion of the District Court dismissing the Company's bill should be affirmed.

[22] *Munn* v. *Illinois, supra.*