**CENTRE FOR the INDEPENDENCE OF JUDGES AND LAWYERS OF the UNITED STATES, INC., Plaintiff,**

v.

**Ralph R. MABEY, Judge United States Bankruptcy Court, Defendant.**

**No. C 82–0158J.**

United States District Court
D. Utah, C. D.

March 12, 1982.

L. T. Bradt, Spring, Tex., for plaintiff.

Joseph Anderson, Asst. U. S. Atty., Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION

JENKINS, District Judge.

The plaintiff commenced this action through the filing of its complaint on March 3, 1982. Plaintiff complains that defendant has presided over thousands of bankruptcy cases where a local bank on whose board his father sits, is a creditor; that certain orders converting reorganization proceedings (Chapter XI) to liquidation proceedings (Chapter VII) were inappropriate; that certain unnamed attorneys are afraid to properly represent their clients and such unnamed attorneys gave unnamed clients bad advice; that certain international accords give plaintiff special power to complain in this matter; that Walker Bank should not be a depository of estate funds; that this Court should issue certain injunctions; and, that plaintiff be paid a sum of money. The matter is now before this Court for consideration *sua sponte* of the question of subject-matter jurisdiction.

### I. JURISDICTION OF THE FEDERAL COURTS

That the federal courts are courts of limited jurisdiction is a fundamental premise of our American constitutional system. "The limits on federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396,

2403, 57 L.Ed.2d 274 (1978); accord, *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981); *General Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968 (9th Cir. 1981); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3522 (1975).

A party seeking to maintain an action in the federal courts must affirmatively establish the jurisdiction of the court over the subject-matter of his claims before any disposition of the action on the merits is attempted. "The presumption is that the court lacks jurisdiction in a particular case until it has been demonstrated that jurisdiction over the subject matter exists." C. Wright, Law of Federal Courts § 7, at 17 (3d ed. 1976); accord, *Turner v. President, Directors and Company of the Bank of North America*, 4 U.S. (4 Dall.) 8, 1 L.Ed. 718 (1799); *Bingham v. Cabot*, 3 U.S. (3 Dall.) 382, 1 L.Ed. 646 (1798); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1935).

> "[T]he rule, springing from the nature and limits of the judicial power of the United States, is inflexible and without exception which requires this court, of its own motion, to deny its own jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record on which, in the exercise of that power, it is called to act.... This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it."

*Mansfield, Coldwater & Lake Michigan Ry. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). The rule declared in *Mansfield* finds direct reflection in Rule 12(h)(3) of the Federal Rules of Civil Procedure, which provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

The principle declared in the *Mansfield* case and codified in the Federal Rules can properly be called the first principle of federal jurisdiction. The principle is reflected not only in the requirements of proper pleadings and requests for review but in the accepted form of workmanlike briefs and oral argument. *The first duty of counsel is to make clear to the court the basis of its jurisdiction as a federal court. The first duty of the court is to make sure that jurisdiction exists.* If the record fails to disclose a basis for federal jurisdiction, the court not only will but must refuse to proceed further with the determination of the merits of the controversy unless the failure can be cured. This is true whether the case is at the trial stage or the appellate stage, and whether the defect is called to the court's attention "by suggestion of the parties or otherwise." ...

H. Hart & H. Wechsler, The Federal Courts and the Federal System 719 (1953) (emphasis added).

■ The question of jurisdiction is the "threshold inquiry" in all federal proceedings. See e.g., *Reid v. Ford, Bacon & Davis Constr. Corp.*, 405 F.2d 861 (8th Cir. 1969); *Rock Island Millwork Co. v. Hedges-Gough Lumber Co.*, 337 F.2d 24 (5th Cir. 1964); *Roberson v. Harris*, 393 F.2d 123, 124 (8th Cir. 1968); *Rice v. Rice Foundation*, 610 F.2d 471, 474 (7th Cir. 1979). "A court lacking jurisdiction cannot render judgment but must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (emphasis in original); *Bradbury v. Dennis*, 310 F.2d 73 (10th Cir. 1962), *cert. denied*, 372 U.S. 928, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).

■ Determination of the question of jurisdiction need not await action by the parties. The court is empowered to raise the question on its own motion. See *e.g., Citizens Concerned for Separation of Church and State v. City and County of Denver*, 628 F.2d 1289, 1297 (10th Cir. 1980), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69

L.Ed.2d 975; *Pacific Towboat & Salvage Co. v. I.C.C.*, 620 F.2d 727 (9th Cir. 1980); *Rowe v. United States*, 633 F.2d 799 (9th Cir. 1980). Indeed, it *must* do so. The United States Supreme Court has instructed us that "it is the duty of this court to see to it that the jurisdiction of the [district court], which is defined and limited by statute, is not exceeded." *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908); accord, *City of Kenosha, Wisconsin v. Bruno*, 412 U.S. 507, 511, 93 S.Ct. 2222, 2225, 37 L.Ed.2d 109 (1973); *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976); *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). The federal courts of appeal and the federal district courts bear an equal obligation to determine their own jurisdiction. "Because we may not proceed without requisite jurisdiction, it is incumbent upon federal courts—trial and appellate—to constantly examine the basis of jurisdiction, doing so on our own motion if necessary." *Save the Bay, Inc. v. United States Army*, 639 F.2d 1100, 1102 (5th Cir. 1981). "If the parties do not raise the question of lack of jurisdiction, it is the duty of the federal court to determine the matter *sua sponte*. *Atlas Life Insurance Co. v. W. I. Southern Inc.*, 306 U.S. 563, 59 S.Ct. 657, 83 L.Ed. 987 (1939); ..." *Basso v. Utah Power & Light Co.*, supra, 495 F.2d at 909 (citation omitted); see *Matter of Kutner*, 656 F.2d 1107, 1110 (5th Cir. 1981).

■ This Court "must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction, ..." *Citizens Concerned for Separation of Church and State v. City and County of Denver*, supra, 628 F.2d at 1301; accord, *Northwest Airlines, Inc. v. Air Line Pilots Ass'n*, 373 F.2d 136, 142 (8th Cir. 1967), *cert. denied* 389 U.S. 827, 88 S.Ct. 77, 19 L.Ed.2d 83. In doing so, it is appropriate to look to the pleadings filed by the plaintiff, for the reason that "[t]he party invoking the jurisdiction of the court has the duty to establish that federal jurisdiction does exist," *Basso v. Utah Power & Light Co.*, supra, 495 F.2d

at 909; *Wilshire Oil Co. of Texas v. Riffe*, 409 F.2d 1277, 1282 (10th Cir. 1969) and bears the burden of proof as to jurisdictional facts and allegations. *Id.*, *Becker v. Angle*, 165 F.2d 140 (10th Cir. 1947); *Pettinelli v. Danzig*, 644 F.2d 1160, 1161 (5th Cir. 1981); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir. 1971); *Lehigh Val. Industries, Inc. v. Birenbaum*, 527 F.2d 87, 92 (2d Cir. 1975). However, "[t]he trial court is not bound by the pleadings of the parties, but may, of its own motion, if led to believe that its jurisdiction is not properly invoked, 'inquire into the facts as they really exist.' *Wetmore v. Rymer*, 169 U.S. 115, 120, 18 S.Ct. 293, 295, 42 L.Ed. 682; ..." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 184, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1936).

■ A federal court's duty to constantly supervise its own jurisdiction includes the duty to examine the "case or controversy" requirement imposed by Article III, Section 2 of the United States Constitution. This Court, therefore, may—indeed must—inquire of the justiciability of an action brought before it, including inquiry into the standing of the party to bring it. See *Citizens Concerned for Separation of Church and State v. City and County of Denver*, supra, 628 F.2d at 1294–1301; *Western Mining Council v. Watt*, 643 F.2d 618, 623–624 (9th Cir. 1981); see also *Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977). "[T]hose who seek to invoke the power of the federal courts must allege an actual case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493, 94 S.Ct. 669, 674, 38 L.Ed.2d 674 (1974). The issues raised by the party invoking jurisdiction must "present a real and substantial controversy which unequivocally calls for the adjudication of ... rights." *Poe v. Ullman*, 367 U.S. 497, 509, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961) (Brennan, J., concurring). And the party must have "standing", because "[t]he Art. III *judicial power exists only to redress or otherwise to protect against injury to the complaining*

*party*, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .' " *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), *quoting Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973) (emphasis added).

Beyond the obligation upon this Court to be the watchdog of its own jurisdiction, additional policy concerns justify disposition of this matter at an early stage of the proceedings.

Accusations have electronic wings. In the race to the public mind truth often runs a poor second. Thus one motivated to accuse another should be sure of his legal and factual ground, and should plead the factual basis of his charges with specificity.

In this instance because of the patent defects on the face of the complaint, the public and the parties are entitled to action on the part of this Court at this early stage.

## II. STANDING

The nature of the allegations of the complaint in this action forces an immediate inquiry: Does the Centre for the Independence of Judges and Lawyers have the requisite "standing" to bring this action?

The question of standing "has its constitutional origins in the 'case or controversy' limitation of Article III which insures that courts exercise their power only in cases where true adversary context allows informed judicial resolution." *Wiley v. National Collegiate Athletic Ass'n*, 612 F.2d 473, 475 (10th Cir. 1979). Standing requires "as a constitutional minimum that a plaintiff allege 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination' " of difficult constitutional and legal questions. *Western Mining Council v. Watt*, 643 F.2d 618, 623 (9th Cir. 1981), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703,

7 L.Ed.2d 663 (1962). The principles and policies which guide the courts in determining questions of standing were the subject of recent and authoritative exposition by the United States Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In that opinion, the Court comments as follows:

Article III of the Constitution limits the "judicial power" of the United States to the resolution of "cases" and "controversies." The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity "to adjudge the legal rights of litigants in actual controversies." *Liverpool Steamship Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 [5 S.Ct. 352, 355, 28 L.Ed. 899] (1885). The requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process. The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments, this Court said 90 years ago, "is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy." *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345 [12 S.Ct. 400, 402, 36 L.Ed. 176] (1892). Otherwise, the power "is not judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States." *United States v. Ferreira*, 13 How. 40, 48 [14 L.Ed. 42] (1852).

As an incident to the elaboration of this bedrock requirement, this Court has always required that a litigant have "standing" to challenge the action sought

to be adjudicated in the lawsuit. The term "standing" subsumes a blend of constitutional requirements and prudential considerations, see *Warth v. Seldin*, 422 U.S. 490, 498 [95 S.Ct. 2197, 2204, 45 L.Ed.2d 343] (1975), and it has not always been clear in the opinions of this Court whether particular features of the "standing" requirement have been required by Art. III *ex proprio vigore*, or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution. See *Flast v. Cohen*, 392 U.S. [83], at 97 [88 S.Ct. 1942, at 1951, 20 L.Ed.2d 947].

A recent line of decisions, however, has resolved that ambiguity, at least to the following extent: *at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).[1] In this manner does Art. III limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen, supra,* [392 U.S.] at 97 [88 S.Ct. at 1951].

The requirement of "actual injury redressable by the court," *Simon, supra* [426 U.S.] at 39 [96 S.Ct. at 1924], serves several of the "implicit policies embodied in Article III," *Flast, supra* [392 U.S.] at 96 [88 S.Ct. at 1950]. It tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action. The "standing" requirement serves other purposes. Because it assures an actual factual setting in which the litigant asserts a claim of injury in fact, a court may decide the case with some confidence that its decision will not pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court.

The Art. III aspect of standing also reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order. The federal courts have abjured appeals to their authority which would convert the judicial process into "no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States v. SCRAP*, 412 U.S. 669, 687 [93 S.Ct. 2405, 2415, 37 L.Ed.2d 254] (1973). Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of "standing" would be quite unnecessary. But the "cases and controversies" language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums. As we said in *Sierra Club v. Morton*, 405 U.S. 727, 740 [92 S.Ct. 1361, 1368, 31 L.Ed.2d 636] (1972):

"The requirement that a party seeking review must allege facts showing

---

1. See *Watt v. Energy Action Educational Foundation*, —— U.S. ——, —— [102 S.Ct. 205, 212, 70 L.Ed.2d 309] (1981); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72 [98 S.Ct. 2620, 2630, 57 L.Ed.2d 595] (1978); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 262 [97 S.Ct. 555, 561, 50 L.Ed.2d 450] (1977); *Warth v. Seldin*, 422 U.S. 490, 499 [95 S.Ct. 2197, 2205, 45 L.Ed.2d 343] (1975); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 218, 220–221 [94 S.Ct. 2925, 2930, 2931–2932, 41 L.Ed.2d 706] (1974); *United States v. Richardson*, 418 U.S. 166, 179- 180 [94 S.Ct. 2940, 2947–2948, 41 L.Ed.2d 678] (1974); *O'Shea v. Littleton*, 414 U.S. 488, 493 [94 S.Ct. 669, 674, 38 L.Ed.2d 674] (1974); *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 618 [93 S.Ct. 1146, 1148, 1149, 35 L.Ed.2d 536] (1973).

[Footnote by the Supreme Court.]

that he is himself adversely affected ... does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome."

The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show "injury in fact" resulting from the action which they seek to have the Court adjudicate. (Emphasis added).

*Id.*, —— U.S. at ——, 102 S.Ct. at 759. The recent treatment of standing by the United States Court of Appeals reflects total accord with the general principles expressed by the Supreme Court in *Valley Forge.* See *e.g., City and County of Denver v. Matsch*, 635 F.2d 804, 807–809 (10th Cir. 1980); *Citizens Concerned for Separation of Church and State v. City and County of Denver*, 628 F.2d 1289, 1294–1301 (10th Cir. 1980).

■ Of most importance to this case is the requirement that a plaintiff must assert a "distinct and palpable injury," *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206, to its own interests to establish "standing".

To demonstrate that it has standing, however, [plaintiff] must also show that there is a "fairly traceable" causal connection between the injury it claims and the conduct it challenges, *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261 [97 S.Ct. 555, 561, 50 L.Ed.2d 450] (1977), so that if the relief sought is granted, the injury will be redressed, *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–46 [96 S.Ct. 1917, 1925–1928, 48 L.Ed.2d 450] (1976).

*Watt v. Energy Action Educational Foundation*, —— U.S. ——, ——, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981). Pleading a "generalized" or "abstract" grievance allegedly shared by a large or remote class of citizens alone is insufficient. See *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 218, 94 S.Ct. 2927, 2930, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). "[U]nadorned speculation will not suffice to invoke the federal judicial power." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976).

■ The plaintiff's complaint filed herein offers no more than patently unadorned speculation upon the actions of the defendant judge. A careful review of the pleading leaves no other conclusion possible than a finding that the plaintiff lacks the requisite standing to bring this action.

*First*: The plaintiff Centre alleges no "injury in fact" to itself or its own interests. The Centre is a stranger to the nineteen bankruptcy matters about which it complains. It nowhere alleges that the Centre was a debtor, a creditor, a successor to either, or a party in interest of any other kind. It in no way suggests that it enjoyed any status at all in any of the nineteen cases. In short, if my neighbor gets hurt through the actions of another, I can't complain. He can.

An interested party in bankruptcy proceedings is consistently afforded the opportunity to appeal if it does not agree with a judicial determination made by the bankruptcy judge. Simple appellate procedures are set forth in the United States Code and in the Bankruptcy Rules. See 28 U.S.C. § 1334; Rules 801–814, Rules of Bankruptcy Procedure. The number of bankruptcy appeals filed across the country testifies as to the availability and use of the appellate process.[2]

■ That specific debtors did not avail themselves of the bankruptcy appeals procedure does not by itself translate into a "distinct and palpable injury," or for that

---

2. In the twelve-month period ending June 30, 1980, there were 1,406 bankruptcy appeals filed in the United States District Courts. For the similar period ending June 30, 1981, there were 1,724 such appeals filed. See Admin.Off. of the U. S. Courts, Annual Report of the Director, 1981, at p. A-16 (1981).

matter, *any* injury in fact to the Centre for the Independence of Judges and Lawyers.[3] Likewise, any problems that arise in the relationship between a debtor and his or her attorney are entirely remote from any conceivable injury in fact that the Centre itself could suffer.[4]

The Centre's most dramatic allegations pertain to purported conflicts of interest involving Judge Mabey and at least one institutional creditor appearing in the bankruptcy court. The complaint, however, alleges no conflict of interest on the part of Judge Mabey in his adjudication of any action involving the Centre either directly or indirectly. Nowhere does the Centre allege an injury in fact to itself or its interests.

 There is no question that one who sits in judgment should disqualify or recuse himself in true conflict of interest situations. The Judicial Code clearly provides that a judge should step aside under any of the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b), as amended (1978). Beyond that, § 455(a) provides that a judge should disqualify himself "in any proceeding in which his impartiality might reasonably be questioned."

It is important to note at this point that "proceeding" is defined for the purposes of Section 455 as including "pretrial, trial, appellate review, or other stages of litigation; . . ." 28 U.S.C. § 455(d)(1) (1978). Construing this statute according to the plain meaning of its terms would readily lead one to conclude that it is directed to potential conflicts of interest in the context of an *adversary* proceeding, rather than to the

---

**3.** That the "injury in fact" requirement applies to determine the standing of "public interest" organizations concerned with specialized issues was settled by the United States Supreme Court in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See also *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

**4.** No debtor is required to proceed in the bankruptcy court through an attorney. Under Rule 910 of the Rules of Bankruptcy Procedure, "A bankrupt, creditor, or other party may appear in a bankruptcy case and act . . . in his own behalf . . . ," or be represented by a licensed attorney of his choosing.

administration of a nonadversary bankruptcy case.[5]

There is nothing inappropriate in presiding over a bankruptcy case in contrast to an adversary proceeding where a bank on whose board one's father may sit may be a named creditor in the bankrupt's schedules.

Of course, in a matter which goes to contest, an adversary proceeding—what is commonly known as a lawsuit—among identified parties, the Code clearly requires under appropriate circumstances that a judge recuse himself.

Whether in the exercise of his sound discretion [6] the bankruptcy judge did or did not disqualify himself from presiding over a particular case, or adversary proceeding, however, forms no basis for a suit seeking damages commenced by a stranger to the case or adversary proceeding.

An interested party in an adversary proceeding—a law suit in a bankruptcy case, can always file a suggestion that the judge recuse or disqualify himself. Cf. 28 U.S.C. § 144 (1976); *Fish v. East*, 114 F.2d 177 (10th Cir. 1940); *Dubnoff v. Goldstein*, 385 F.2d 717 (2d Cir. 1967). The party may know something the judge does not. It is good practice for a party to ask, particularly when prompted by appropriate circumstances.

A nonparty, however, will not be heard to complain in a damages action of the action or inaction of a judge in a case or adversary proceeding in which the nonparty was neither a participant nor directly interested. The "case or controversy" requirement of Article III applies to lawsuits against judges as strongly as it does to all others. To establish its standing to maintain such an action, a party must allege the requisite

"personal stake" in the outcome that would justify the exercise of judicial power.

This the Centre has failed to do.

As to the Centre's allegations regarding use of Walker Bank (now First Interstate Bank) as a depository designated by the Bankruptcy Court pursuant to the Rules, the complaint asserts no injury in fact as to anyone. No substantive violation of the Rules of Bankruptcy Procedure is alleged. See Rule 512, Rules of Bankruptcy Procedure; 11 U.S.C. § 345 (1978).

Nor does the complaint allege a substantive violation of the Bankruptcy Code or Rules involving conversion of cases from "chapter" proceedings to liquidation proceedings. See 11 U.S.C. §§ 1112, 1307; Rule 122, Rules of Bankruptcy Procedure. While the Centre alleges that conversion itself was somehow injurious to some or all of the nineteen debtors it cites, no interest, participation or involvement by the Centre itself is alleged. No "injury in fact" is asserted.

*Second*: The Centre appears to assert that it has standing to complain on behalf of third persons, debtors who are not parties to this case, somehow based upon the nature of its claims. However, no adequate foundation in law is set forth in the complaint.

"In the ordinary case, a party is denied standing to assert the rights of third persons." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977), *citing Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Tileston v. Ullman*, 318 U.S. 44, 46, 63 S.Ct. 493, 494, 87 L.Ed. 603 (1943). While Congress may by statute confer rights "the invasion of which creates standing" where there would otherwise be

---

**5.** See also Rule 505 of the Rules of Bankruptcy Procedure, which specifically deals with bankruptcy judges and any problems of nepotism, influence and interest. Rule 505(b)(2) calls for a bankruptcy judge to disqualify himself "if his acting therein would justify the impression that any person can improperly influence him or unduly enjoy his favor, or that he is affected by the kinship, rank, position or influence of any

party or other person." The Centre's complaint alleges nothing that would reasonably justify such an impression.

**6.** Cf. *Shadid v. Oklahoma City*, 494 F.2d 1267, 1268 (10th Cir. 1974); *Weiss v. Hunna*, 312 F.2d 711, 714 (2d Cir. 1963), *cert. denied* 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073.

none, *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148 n.3, 35 L.Ed.2d 536 (1973), no congressional enactment "can lower the threshold requirements of standing under Art. III." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, ——, 102 S.Ct. 752, 766 n.24, 70 L.Ed.2d 700 (1982).

> In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself, [*Warth v. Seldin,* 422 U.S. 490, 501 [95 S.Ct. 2197, 2206, 45 L.Ed.2d 343] (1975) ], that is likely to be redressed if the requested relief is granted. *Simon v. Eastern Ky. Welfare Rights Org., supra,* [426 U.S. 26] at 38 [96 S.Ct. 1917 at 1924, 48 L.Ed.2d 450].

*Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

Neither Act of Congress nor considerations of judicial policy [7] can act to confer standing on the Centre notwithstanding the "injury in fact" requirement. Nor, as we shall see, can assertion of claims under international law expand the jurisdiction of the federal courts beyond the constitutional limits set forth in Article III. See Part III, *infra.* The claim that a government, or an officer thereof, has violated the law—be it constitutional, municipal, or international— "does not provide [plaintiffs] a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." *Valley Forge Christian College, supra,* —— U.S. at ——, 102 S.Ct. at 766.

As far as alleged judicial misconduct is concerned, Congress has provided a separate complaint procedure which is an appropriate "vehicle for the vindication of value interests of concerned bystanders," *United States v. SCRAP,* 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973), and which is embodied in the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, Act of October 15, 1980, Pub.L.No.96–458, 94 Stat. 2035, *now codified at* 28 U.S.C. § 372(c). In an appropriate case, redress may be sought through that procedure.

The federal courts, however, remain constitutionally bound to act as more than "merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding," *Valley Forge Christian College, supra,* —— U.S. at ——, 102 S.Ct. at 759, particularly in the absence of an actual "case or controversy" between parties demonstrating genuine adversity of interests.

■■■ Without the requisite showing of "standing" under Article III, the plaintiff may not ask this Court to proceed further with any determination on the merits of its broad allegations. Appropriately considered upon the pleadings,[8] this Court now determines that the plaintiff lacks the necessary standing to invoke the judicial power of the federal court in this action. Compare *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

### III. INTERNATIONAL LAW CLAIMS

The Centre has asserted several international legal documents as the basis of its claims herein. The remaining inquiry is whether these documents, standing alone,[9]

---

**7.** See *Valley Forge Christian College, supra,* —— U.S. ——, ——, 102 S.Ct. 752, 755–756 & nn. 1–6, 70 L.Ed.2d 700 (Brennan, J. dissenting).

**8.** See *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979); *Citizens Concerned for Separation of Church and State,* 628 F.2d 1289, 1297 (10th Cir. 1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975.

**9.** This is not, for example, a case arising within the terms of 28 U.S.C. § 1350 (1976). That

section, enacted originally as Section 9(b) of the Judiciary Act of 1789, 1 Stat. 73, 77 (1789), reads as follows:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

See *e.g., Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir. 1980). Nor does plaintiff's complaint come within any enumerated category of jurisdiction under Article III dealing with foreign

provide sufficient legal basis to sustain an action not otherwise justiciable under Article III of the United States Constitution.

■ This Court has little trouble with the proposition that rights, duties, privileges and immunities created or recognized under international law are cognizable by the courts of the United States in an appropriate case. Concern for the recognition of the law of nations found frequent expression through the Framers of the Constitution. See e.g., Dickinson, "The Law of Nations as a Part of the National Law of the United States," 101 U.Pa.L.Rev. 26 (1952). One of the defects in the Articles of Confederation that the Constitution was drafted to remedy was the central government's inability to "cause infractions of treaties or of the law of nations, to be punished." 1 M. Farrand, ed., The Records of the Federal Convention of 1787 19 (rev. ed. 1937) (notes of James Madison). From the beginning, the federal courts have acknowledged their competence to hear and determine cases involving the law of nations. In The Nereide, 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1915), Chief Justice John Marshall observed that at least in the absence of a governing Act of Congress,[10] the federal courts are "bound by the law of nations, which is a part of the law of the land." In The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), the United States Supreme Court reiterated Marshall's views:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.

See also Kansas v. Colorado, 206 U.S. 46, 97, 27 S.Ct. 655, 667, 51 L.Ed. 956 (1907).

Recent decisions by the federal courts are wholly in harmony with this view. See e.g., Skiriotes v. Florida, 313 U.S. 69, 72–73, 61 S.Ct. 924, 927–928, 85 L.Ed. 1193 (1941); Filartiga v. Pena-Irala, 630 F.2d 876, 885–887 (2d Cir. 1980) ("[T]he law of nations . . . has always been a part of the federal common law."); Dreyfus v. von Finck, 534 F.2d 24, 30 (2d Cir. 1976); Smith v. Canadian Pacific Airways, Ltd., 452 F.2d 798 (2d Cir. 1971); Diggs v. Richardson, 555 F.2d 848, 849–850 (D.C.Cir.1976); United States v. Postal, 589 F.2d 862, 873–884 (5th Cir. 1979); In re Alien Children Ed. Litigation, 501 F.Supp. 544, 589–596 (S.D.Tex.1980), prob. juris. noted sub. nom. Texas v. Certain Named and Unnamed Alien Children, 452 U.S. 937, 101 S.Ct. 3078, 69 L.Ed.2d 950 (June 15, 1981); see also Sprout, "Theories as to the Applicability of International Law in the Federal Courts of the United States," 26 Am.J.Intl.L. 280 (1932).

The plaintiff herein asserts claims under five international legal documents:[11] (1) Sections VII and VIII of Part 1(a) of the Final Act, Conference on Security and Co-operation in Europe, Helsinki, August 1975, reprinted in 73 U.S.State Dept. Bull. 323, 325 (1975); (2) The U.N. International Covenant on Civil and Political Rights, Part I, Art. I, ¶¶ 1 & 2, (Adopted and Opened for Signature, Ratification and Accession by General Assembly Resolution 2200A (XXI) of Dec. 16, 1966; entry into force pursuant to Art. 49 of the Covenant, Mar. 23, 1976), U.N.Gen.Ass.Off.Rec., 21st Sess., Supp. No. 16 (A/6316), at 52; (3) the U.N. Universal Declaration of Human Rights, Arts. 2, 7, 8, and 17 ¶¶ 1 & 2, (Proclaimed by General Assembly Resolution 217 (III) of Dec. 10, 1948), U.N.Gen.Ass.Off.Rec., 3d Sess., Resolutions (A/810), at 71; (4) the U.N. International Covenant on Economic, Social and

---

relations. See U.S.Const., Art. III, § 2; H. Hart & H. Wechsler, The Federal Courts and the Federal System 21–23 (1953).

10. It has been a well-settled rule of statutory construction that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." The Charming Betsy, 6 U.S. (2 Cranch) 64, 67, 2 L.Ed. 208 (1804); Lauritzen v.

Larsen, 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953); Restatement of the Foreign Relations Law of the United States § 3(c)(3) & comment j. (1965).

11. A copy of the portions of each document relied upon by the plaintiff is annexed hereto as Appendix A.

*Cultural Rights*, Art. I, ¶ 1 (Adopted and Opened for Signature, Ratification and Accession by General Assembly Resolution 2200A (XXI) of Dec. 16, 1966; entry into force pursuant to Art. 27 of the Covenant, Jan. 3, 1976); and (5) the OAS *American Convention on Human Rights*, Art. 21 ¶¶ 1, 2 & 3, and Art. 25, ¶ 1 (signed Nov. 22, 1969; entered into force pursuant to Art. 74 of the Convention, July 18, 1978) O.A.S. Treaty Series No. 36, at 1, O.A.S. Off.Rec. OEA/Ser. L/V/II.23 doc. (rev. 2 Engl. 1975).[12]

■ It simplifies matters to observe at this point that the Centre's claims in no way arise "under the . . . treaties of the United States." 28 U.S.C. § 1331 (1981); U.S.Const., Art. II, Sec. 2. None of the documents relied upon by the Centre have received Senate ratification as treaties, and do not have the force of treaty law within the United States.[13] See 81 U.S.State Dept. Bull. 75 (Dec. 1981) (American Conv. on Human Rights not in force in U.S.); *id.*, 60 (June 1981) (U.N. Covenants not in force in U.S.). The United Nations *Universal Declaration of Human Rights* is on its face a U.N. General Assembly Resolution, see 5 M. Whiteman, Digest of International Law 243 (1965), and the *Final Act* of the Helsinki Conference expressly disclaims treaty status.[14] President Ford described the legal status of the Helsinki Agreement before he attended the final meetings:

I will emphasize that the document I will sign is neither a treaty nor is it

legally binding on any participating state. The Helsinki documents involve political and moral commitments aimed at lessening tensions and opening further the lines of communication between the peoples of East and West.

73 U.S. Dept. State Bull. 204, 205 (1975). Beyond that, nothing alleged in the complaint contravenes either the letter or the spirit of the principles expressed in VII and VIII of Part 1(a) of the Final Act. Principle VII deals in large part with human rights of national minorities, Principle VIII with equal rights and self-determination of peoples—a concept far afield from the issues raised in the complaint. See *e.g.*, I. Brownlie, Principles of Public International Law 575–578 (2d ed. 1973); see also T. Buergenthal, ed. Human Rights, International Law and the Helsinki Accord [15] (1977).

Unless or until ratified as treaties, those documents at best serve as evidence of international "common law," or customary international law. See *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980); *In re Alien Children Ed. Litigation*, 501 F.Supp. 544, 595–596 (S.D.Tex.1980); *Brownlie, supra*, at 4–15.

In essence, the plaintiff is asking this Court to elevate the allegations of the complaint to the level of violations of universally accepted international law principles, placing the defendant judge's conduct in presiding over the bankruptcy court for this District in the same league with piracy on

**12.** The United Nations Covenants cited *supra* are part of what has been informally termed the International Bill of Rights. See L. Henkin, ed., The International Bill of Rights: The Covenant on Civil and Political Rights (1981).

**13.** In fact, the two U.N. Covenants and American Convention were three of four documents submitted for Senate approval in a Presidential Message by President Carter on February 23, 1978. See Message of the President Transmitting Four Treaties Pertaining to Human Rights, Sen.Exec.Doc.Nos. 95–C, –D, –E, and –F, 95th Cong., 2d Sess. (1978); 78 U.S.State Dept.Bull. 48 (Apr.1978). The Senate has taken no significant action on the treaties since then.

**14.** The text of the Final Act states that it "is not eligible for registration under Article 102 of the Charter of the United Nations," the mecha-

nism by which a treaty may be filed and thereafter invoked before any organ of the U.N. 73 U.S.State Dept.Bull. 323, 349 (1975).

**15.** Even if ratified, there remains the separate issue of whether each would be self-executing, and whether each would vest rights of action in private individuals and jurisdiction in the federal courts to hear cases arising under them. See *United States v. Postal*, 589 F.2d 862, 873–884 (5th Cir. 1979); *Diggs v. Richardson*, 555 F.2d 848, 850 (D.C.Cir.1976); *People of Siapan v. U.S. Dep't of the Interior*, 502 F.2d 90, 101 (9th Cir. 1974) (Trask, J. concurring); *Sei Fujii v. State*, 38 Cal.2d 718, 721–722, 242 P.2d 617, 620 (1952).

the high seas, see *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–62, 5 L.Ed. 57 (1820), and acts of torture. See *Filartiga v. Pena-Irala, supra*, 630 F.2d at 882.

That is a quantum leap this Court is entirely unwilling to make. Compare *Hamilton v. Regents of the University of California*, 293 U.S. 245, 265, 55 S.Ct. 197, 205, 79 L.Ed. 343 (1934) (university military science course requirement not in conflict with Kellogg-Briand Peace Pact).

 While, in an appropriate case, the documents cited by the plaintiff might properly supply the rule of decision to be applied to particular facts, see *Filartiga v. Pena-Irala, supra*, 630 F.2d at 880–890; *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), nothing appears in the documents that vests in private individuals the right to go into domestic tribunals to collect awards of damages for wrongs allegedly done to others. Nothing in the documents, whether treated as customary international law or not, authorizes a federal court to assume jurisdiction that is otherwise forbidden it under Article III of the Constitution.

The only tenable conclusion remaining is that this action should be dismissed for lack of jurisdiction. The Centre fails to allege adequate "standing" to maintain this action, either under American Constitutional Law or the Law of Nations.[16]

## IV. JUDICIAL IMMUNITY

 Absent an overriding principle of public international law or constitutional law, the defendant remains clothed in absolute immunity as to his official acts unless and until that immunity is expressly abrogated by Congress. See *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

## V. PROCEDURAL QUESTIONS

In light of procedural defects reflected in the form of the plaintiff's complaint, allowing the matter to be filed at all seems to have been more a matter of grace than of right. One defect in the complaint is the failure of counsel for the plaintiff to sign the pleading, denying it the certification called for by Rule 11 of the Federal Rules of Civil Procedure:

> Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. . . . *The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information and belief there is good ground to support it; and that it is not interposed for delay.* If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilfull violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted. (Emphasis added).

A pleading lacking such certification where counsel is otherwise named of record does not justify the credence a court might otherwise give as to its adequacy, had it been examined and signed by someone trained to make professional judgments.

In light of the nature of the claims alleged, the plaintiff's complaint could well justify the exercise of the court's power under Rule 12(f): "[U]pon the court's own initiative at any time, the court may order stricken from any pleading any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f), Federal Rules of Civil Procedure. This Court's determination of the issue of jurisdiction renders the exercise of its powers under Rule 12(f) or Rule 11 unnecessary.

## VI. CONCLUSION

The plaintiff's purported claims against the defendant herein have been asserted in

---

**16.** There is doubt whether individuals may assert claims under international law against their own governments at all. See *Dreyfus v. von Finck*, 534 F.2d 24, 31 (2d Cir. 1976).

a procedurally inappropriate manner. If one who is interested does not approve of what a bankruptcy judge—or any judge—does in a particular case, one appeals and has another tribunal take a second look. The above-entitled action, of course, is not an appeal. It cannot be substituted for an appeal not taken. Sound and fair principles of jurisprudence hold that when a party fails to appeal, the judgment of the lower court is conclusive, both as to the original parties, and as to subsequent parties who in some way succeed to an original party's interests. See 1B Moore's Federal Practice ¶¶ 0.416[1], [5], 0.441[2] (2d ed. 1981).

The United States District Courts sit as courts of direct appeal from the United States Bankruptcy Courts, not as courts of collateral attack upon bankruptcy judges or their judicial actions. See 28 U.S.C. § 1334 (1978). Consequently, it is in the interest of all concerned that this case be dismissed.

Since we have dealt with this matter as we have there is at this point no need to pass upon the motion of L. T. Bradt, Esq., to enter his appearance *pro hac vice* in this action. He suggests that this Court make an exception to Rule 1 of the Rules of Practice for this District, and not require the affiliation of local counsel in this case.

The local counsel rule has merit. Local counsel can be helpful in complying with local standards—particularly as to the certification required by Rule 11 of the Federal Rules of Civil Procedure, or as to evaluating broad allegations against a background of familiar realities.

The complaint in the above-entitled action should be dismissed.

### APPENDIX A

1. U.N. Universal Declaration of Human Rights [excerpts]:

\* \* \* \* \* \*

### ARTICLE 2

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

\* \* \* \* \* \*

### ARTICLE 7

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

### ARTICLE 8

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

\* \* \* \* \* \*

### ARTICLE 17

1. Everyone has the right to own property alone as well as in association with others.

2. No one shall be arbitrarily deprived of his property.

\* \* \* \* \* \*

2. U.N. International Covenant on Civil and Political Rights [excerpts]:

### PART I

### *Article 1*

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

2. All peoples may, for their own ends, freely dispose of their natural wealth and resources without prejudice to any obligations arising out of international economic co-operation, based upon the

principle of mutual benefit, and international law. In no case may a people be deprived of its own means of subsistence.

\* \* \* \* \* \*

3. U.N. International Covenant on Economic, Social and Cultural Rights [excerpts]:

### PART I

#### Article 1

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

\* \* \* \* \* \*

4. O.A.S. American Convention on Human Rights [excerpts]:

\* \* \* \* \* \*

#### Article 21. Right to Property

1. Everyone has the right to the use and enjoyment of his property. The law may subordinate such use and enjoyment to the interest of society.

2. No one shall be deprived of his property except upon payment of just compensation, for reasons of public utility or social interest, and in the cases and according to the forms established by law.

3. Usury and any other form of exploitation of man by man shall be prohibited by law.

\* \* \* \* \* \*

#### Article 25. Right to Judicial Protection

1. Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention, even though such violation may have been committed by persons acting in the course of their official duties.

2. The States Parties undertake:

a. to ensure that any person claiming such remedy shall have his rights determined by the competent authority provided for by the legal system of the state;

b. to develop the possibilities of judicial remedy; and

c. to ensure that the competent authorities shall enforce such remedies when granted.

\* \* \* \* \* \*

5. Final Act, Conference on Security and Cooperation in Europe, Helsinki, 1975 (Helsinki Accords) [excerpts]:

\* \* \* \* \* \*

#### VII. Respect for human rights and fundamental freedoms, including the freedom of thought, conscience, religion or belief

The participating States will respect human rights and fundamental freedoms, including the freedom of thought, conscience, religion or belief, for all without distinction as to race, sex, language or religion.

They will promote and encourage the effective exercise of civil, political, economic, social, cultural and other rights and freedoms all of which derive from the inherent dignity of the human person and are essential for his free and full development.

Within this framework the participating States will recognize and respect the freedom of the individual to profess and practise, alone or in community with others, religion or belief acting in accordance with the dictates of his own conscience.

The participating States on whose territory national minorities exist will respect the right of persons belonging to such minorities to equality before the law, will afford them the full opportunity for the actual enjoyment of human rights and fundamental freedoms and will, in this manner, protect their legitimate interests in this sphere.

The participating States recognize the universal significance of human rights and fundamental freedoms, respect for which is an essential factor for the peace, justice and well-being necessary to ensure

the development of friendly relations and co-operation among themselves as among all States.

They will constantly respect these rights and freedoms in their mutual relations and will endeavour jointly and separately, including in co-operation with the United Nations, to promote universal and effective respect for them.

They confirm the right of the individual to know and act upon his rights and duties in this field.

In the field of human rights and fundamental freedoms, the participating States will act in conformity with the purposes and principles of the Charter of the United Nations and with the Universal Declaration of Human Rights. They will also fulfill their obligations as set forth in the international declarations and agreements in this field, including inter alia the International Covenants on Human Rights, by which they may be bound.

#### VIII. *Equal rights and self-determination of peoples*

The participating States will respect the equal rights of peoples and their right to self-determination, acting at all times in conformity with the purposes and principles of the Charter of the United Nations and with the relevant norms of international law, including those relating to territorial integrity of States.

By virtue of the principle of equal rights and self-determination of peoples, all peoples always have the right, in full freedom, to determine, when and as they wish, their internal and external political status, without external interference, and to pursue as they wish their political, economic, social and cultural development.

The participating States reaffirm the universal significance of respect for and effective exercise of equal rights and self-determination of peoples for the development of friendly relations among themselves as among all States; they also recall the importance of the elimination of any form of violation of this principle.

\*　　\*　　\*　　\*　　\*　　\*

Sources:

N. Leech, C. Oliver & J. Sweeney, The International Legal System—Documentary Supplement (1973) [docs. 1, 2 & 3].
R. Lillich & F. Newman, International Human Rights: Problems of Law and Policy 985–1011 (1979) [doc. 4].
73 U.S. Dept. State Bull. 323, 325–326 (1975) [doc. 5].